Our last case this morning is a patent case, UNIMAX ADVANCED BIOFUELS v. BENAMI May it please the court, counsel. Good morning. Your honors have read the material, so I'd like to get to what is really the key issue, which is claim construction in this case, because that's where the fundamental abuse of discretion came from. That's an error. And we do have a Markman in this case in January, a Markman hearing in January. So I'd like to actually just walk your honors through the fundamental issue here in this area. Let me just ask you a question here. I think you make a good point that the district court's claim construction is problematic, that the use of the word solely, it's difficult to read the definition as that way, if for no other reason because it exceeds the definition and excludes some of the preferred embodiments that are listed there. I think you make a good point about that. But why isn't the correct construction of that definition of provision that it's NADPH dependent or that it prefers NADPH, which is a construction which would make the definition consistent with the preferred embodiments, and which I understand would still exclude the accused product here. So could you help me with that? Certainly, your honor. We start with what the specification says. And there the specification in column seven says that a CARI, that's the abbreviation everyone uses, is an enzyme that uses NADPH. So the question is, what does that mean, that it uses NADPH? It doesn't mean solely. It doesn't mean solely, it doesn't mean exclusively, and there's nothing in the specification or the prosecution history that says NADPH dependent. So that's a new term as it is applied to CARI. That's not in the specification. There is another enzyme on column 12, for example, in column 30, where they're giving an example and they say that enzyme is NADPH dependent. So when the applicants wanted to limit themselves in that manner, they knew how to do it. Now, when you read... Do you read dependent as being the same thing as preferring? That hasn't actually been argued yet in this case, because Givo brought up this concept of dependency. Well, I thought that expert said that it was the same thing. Expert said... That it was the same thing. As using? No, no, no. Maybe you misunderstood my question. That NADPH dependent means the same thing as preferring. Well, actually, Dr. Kirsch used that term, and in his deposition he said he had not defined it in his expert report. And so the concept of preference is not actually in the specification when it goes to the concept of CARI. No, but my question is, can we agree that NADPH dependent means the same thing as preferring NADPH? No, we can't. We can't. Why not? Because as we're approaching Markman and Givo's using a different definition, which is one of efficiency, the patent doesn't talk about efficiency at all. The only thing that the patent talks about is activity. And this paragraph is talking about what was a standard assay at that time for a CARI. If we look at example 2, it talks about a CARI, and it says that the activity is measured using a certain assay. This is at approximately line 46. And so when you look at that, what is that assay? And that's where I think this breaks down and it may become clearer when we understand the assay. And the assay is in the record. What the assay does is it says I'm taking this proposed enzyme, I want to see if it's a CARI. I put the substrate in, I put NADPH in, and I measure whether any of the NADPH has converted to NADP+. If any of that occurs, that means electrons have been donated, and that the CARI enzyme has that reduction, it's a reductase, and an isomerase, and that's the reductase part. So this is the test, the normal characterization of a CARI. That assay, which is what is called out in this patent, doesn't tell you anything about what it prefers, because it doesn't say I put NADH in, and I put NADPH in, it simply says how do I know it's got this electron donating function? It says I put that in, and I see that it has gone ahead and used some of the NADPH. So preference is not in the assay at all. It's a does it use it or not test. And the specification and the file history, and I would point your honors to the file history at 8194 and 8201, and it says in characterizing the enzyme, you use the assay of example two, and that assay has nothing to do. What do you understand the definition to mean here? Of preference? No. Of NADPH dependent? Yes. My current understanding of NADPH dependent is that the turnover rate, so we have an enzyme, right, the enzyme, how many times does it do the reaction in a certain amount of time? And that if it is NADPH dependent, that by a certain order of magnitude, it will act faster than an NADPH dependent enzyme. But under that analysis, the methanococcus enzyme is excluded, because the prior reference with the methanococcus enzyme says that it will work 60% as fast, if you will, using NADH. So when we're talking about that, that's not even... But if dependent means the same thing as preferred, that enzyme would be within the definition, right? Enzymes don't prefer. It's a question of activity rates. And if you put, we'll take this pattern, there's claim two. Claim two says you're using anaerobic conditions. Do we have expert testimony on this? I appreciate that. We do. And where do we find the expert testimony saying what you're saying? Where in this record do we find the expert testimony saying that? That the anaerobic? That dependent means the rate rather than preference. That's in the specification of the patent. The only assay... So there's no expert testimony? Expert testimony, the only expert who talked about dependence was Dr. Kirsch, and he did not define it. So I guess you guys are going to be getting into these questions at the market meeting. I think that's certainly correct, but I think it's also correct that we need to read a patent specification for what it teaches. What about claim 13? I haven't written the description. Claim 13, the expert testimony in this case on claim 13 was from Dr. Kirsch, GEVO's expert. And Dr. Kirsch said, when I read this patent, right away I know it's telling me to knock out the PDC. And that is his testimony. Well and you've got column 12 lines 15 through 18 that discuss prior art enzymes that reduce pyruvate. That's right, decarboxylase. Thanks for helping me. I was seeing the D and stopping. Your honors will note that when I do anti-cases and they're small molecules, I have much more difficulty actually saying the words. So that's my biotech background maybe. Isn't that written description support? Because the patent tells you what you want to do is knock out a side reaction so you get more going straight to where you want it to go. And it says this pyruvate decarboxylase is a big thing that takes off as a side reaction. So if you put two sentences together and it clearly says that. And the examiner obviously found that there was sufficient description. Could we talk about the substantial question of validity? Yes. You've got Bolton and Chen talking about this natural pathway and setting it forth with great detail. You've got Bequia and Yocum talking about adding the yeast that's recombined to that. I recognize that there might be some difficulties with absolute anticipation. But isn't there enough there for at least obviousness? Well, first of all, your honor, the district court did not find obviousness. I understand that. But we're talking about a substantial question of invalidity. Yes, we are. I'm suggesting there's an awful lot of prior art that is all over the area here. Is there enough for a substantial question? No, your honor. If you'd like me to address obviousness, I will do that in my short time rather than anticipation. Anticipate. Give me the vote. Okay. So what the district court said as to anticipation was she said, I find, let's remember what the claim is. We start with the claim always. The claim is a method claim. You're contacting the media with a recombinant yeast. So step one is, does a reference have a recombinant yeast? Step two is, does it have the engineered pathway? And step three is, does it have the right reactions? Four is the right enzymes. And five is whereby that pathway produces isobutanol. There are no references with recombinant yeast where it shows that there is isobutanol produced. The district court... Well, but Bolton's teaching the pathway and the enzymes. Bolton... Chan is kind of reinforcing that. And then you've got Yochum and Bequia and we've been over this. So none of those references are to recombinant enzymes. But then that's where the Yochum, Bequia, those people come in. But let's look at those references. Two of those references were to engineer a different pathway for vitamin B5. So they say, I'm going to engineer and I'm going to make the pathway vitamin B5. That doesn't make making isobutanol obvious. Two of the other references were to go ahead... But does it suggest to one of skill in the art that you can certainly use recombinant yeast in this kind of a setting? That one could use recombinant yeast to engineer something? I think... Well, in the particular pathway, of course, we've got to look at the pathway of Bolton and Chan. Now, Bolton and Chan, those are not proven pathways. And the evidence that we have in the record here... But they're right on. They're evidence of saying, I know that there's this valine pathway, that's called the Ehrlich pathway. Isn't it possible that there's another pathway? And they say, well, I could guess that this is the pathway. They don't show that there is a pathway. And the evidence of record also is, and this is from Dr. Stephanopoulos, GEVO's expert. He says... Are you saying this prior art's not enabling? No. What I was about to say was, GEVO's expert said, prior to Budamex doing this, there was no motivation for anyone to go ahead and do isobutanol production. That motivation, nobody was looking for it. Nobody thought about it. Budamex came up with it. DuPont came up with it. But what I am also saying is, those references, Bolton, those are beer references. And respectfully, that is non-analogous art. Those are interesting arguments, but they're pretty substantial arguments the other way too, right? Well, I think if there's no motivation to go ahead and do this, I think on the face, if we take our standard law of obviousness, we say, what's the prior art? Assuming it's analogous, you say to your honor that there's no evidence in this record that it is analogous. But you say, let's take the closest prior art. Let's say what changes need to be made. Where is the motivation to combine? And that motivation to combine, whether it's testimony or a piece of prior art, there has to be some motivation. And what the evidence from Dr. Stephanopoulos was is, prior to DuPont and Budamex doing this, nobody even thought about it. But counsel, I'm reading into what Judge Dike asked, and maybe I shouldn't, but you're appealing from the denial of a motion for preliminary injunction. And you've got a balancing test in discretion on the part of the court. That is correct, your honor. But we have to do that based on the record and what the district court found. Because we are now looking to see whether the district court abused its the likelihood of invalidity. She did it on a reference, the Leroy reference, which I have now lost, where if you look at the very first page of the Leroy reference, I believe, you will see that here's Leroy. He's saying, the yeast genome has now been mapped. I want to find out what this DNA part does. Don't know what it does. Figures out it codes for speculate. And he uses the word, they use the word speculate about what this enzyme might do. And points to the Ehrlich pathway, this, what I'll call the Bolton pathway for want of a better word, and a third pathway. So there's nothing in that evidence that says that that is the pathway that's working. And he's only saying that's how it would work in nature. I would remind the court that when you engage in recombinant engineering, you can be turning off enzymes. These things, the way this works is you have DNA, but for this pathway to work, you need the enzymes. And for the enzymes, you have to have the DNA turned on for all five enzymes. They need to be transcribed, they need to be translated. And as Dr. Stephanopoulos, Jibo's expert, said, under some conditions it might work, and under some conditions it won't work. That is not necessarily there. Thank you, Ms. Ben-Ami. Let's restore your rebuttal time. Thank you, Your Honor. And would you give Mr. Flattman 20 minutes? That'll be her rebuttal time and a little more. If you need to use that, it's yours, Mr. Flattman. Thank you very much, Your Honor. Good morning, and may it please the Court. Your Honor, I correctly addressed the relevant standard here, which is abuse of discretion on an appeal of a denial of PI, and essentially to overturn that judgment of the district court on the PI. But don't we have a legal error of reading in a term that wasn't in the claim solely? Well, I don't think we have an error, Your Honor. You didn't argue solely for the district court, did you? I don't think we did, Your Honor. I can understand why. But I don't think we need the term solely. I think we can understand the term, as Your Honor suggested. But aren't you stuck with that? That's what's on review here. This Court can look at plain construction de novo and reach a different construction if it so wishes, even on the appeal of the PI. And if we take out the word solely, I don't think we have an error in terms of finding the infringement here. But what you argued was that it meant NADPH dependent, right? That's absolutely correct. And by that, you're experts meant prefer, right? Indeed. And Your Honor asked... But we heard that that really refers to a process rather than a dependency. I can explain that. It's a rate, I think, is what Ms. Benamy said. Yes, I don't think that's correct, Your Honor. There are three classes of carry enzymes. There are those that are NADPH dependent and prefer NADPH. There are those that are NADH dependent that prefer NADH. And there are those that are NADPH or NADH dependent. And these are three separate classes, Your Honor. And this is structural, really, because what you have is formation of a complex, Your Honor, where the coenzyme, the NADPH, let's say, is actually bound to a part of the carry enzyme of a specific class. So we have a structure. The district court correctly read the lexicography in the specification where there was an explicit definitional section as calling for an NADPH dependent carry enzyme. And it did so for a number of reasons. One, there was explicit lexicography. There was a definition, and under this court's precedent, in cases like SINORP count, that is very compelling evidence concerning the claim construction. It also did so because the patentee knew how to define other classes of carry when it wanted to, other classes of enzymes when it wanted to. There are at least three other portions of the specification, which we have pointed out in our brief, where the patentee pointed to NADH and or NADPH dependent enzymes. So when it wanted to characterize an enzyme in that fashion and call out a specific class of enzymes, it knew how to do so. It did not do so here. It didn't need to define its carry with reference necessarily to any... But it does list in the patent as one of the carry enzymes, NADH, and suggests its use in prior art. Why isn't that sufficient to suggest that it wasn't limiting itself to NADPH? Well, Your Honor, it does not call out the carry enzyme as NADH dependent anywhere in the specification. It talks about other enzymes as being NADH dependent. But it never discusses carry enzyme. In fact, in related application, that was filed as a CIP, so it's relevant to claim construction here. It redefined carry as NADH or NADPH dependent. So it realized that it had a restricted definition to a single class of carries in the Patent Act issue, and later on it expanded the definition. And that's relevant as well under this Court's precedent in cases like CAO, in cases like Abbott v. Sanders. It knew how to claim this when it wanted to. It didn't claim it here. It didn't describe it here. And it put in an explicit, narrowing definition to a separate class. Now, Your Honor's asked whether there was testimony, expert testimony, at the hearing concerning dependency, and yes, there was. I found one just quickly in reference to Your Honor's question, the Kirsch testimony at A16568, page 207. He discusses what was explicit to him about the use of NADH and NADPH dependent enzymes. And it is discussed as a matter of a strong preference for that coenzyme, for that particular class of carries. So while the word solely may or may not be the best choice of words in this report's construction, what it clearly means is dependency, strong preference and dependency. And that is a correct definition, as we see in the patent specification. Your Honors, in terms of other reasons why we know this claim construction is correct, we can look at Claim 14. It's a dependent claim from Claim 1. And it adds a limitation that says, uses an NADH cofactor, essentially. Well, that language would have been entirely superfluous if Claim 1 included the use of NADH or the preference for NADH in terms of the court's claim construction. The existence of that claim tells us we know that. Isn't that cut against you by if it would read the O-more out of the claim? If Step 2 is only using NADPH as the electron donor, then the term O-more would be out of the claim. Well, Your Honor, in Claim 14, the NADH-dependent enzyme can be any enzyme. It doesn't have to be the carry. There are five enzymes in this pathway. And as it turns out, if we look at the prior art, we see that the last enzyme in the pathway is actually NADH-dependent. So the carry enzyme, there's no inconsistency. The carry enzyme can be NADPH-dependent, as described in the specification. And then the last step in the pathway can be NADH-dependent. The other enzyme can be NADH-dependent. So there's no inconsistency, Your Honor. And the claim allows for one or more of those enzymes to be NADH-dependent because NADH could operate on any of the other enzymes in that five-step pathway. So the claims are entirely internally consistent, and they lead us towards the district court's claim construction. Now, Your Honor, there was reference to the exclusion of an embodiment First of all, if one embodiment is excluded out of a vast array of embodiments, it can't trump clear lexicography under this court's case law. But the factual matter, this was not proven on the record below that there was any excluded embodiment. Well, I thought that if dependent means preferred, if that's the construction, then all the listed enzymes are within the framework. Absolutely, Your Honor. Even under their interpretation of the facts, that's correct. But their facts are actually wrong. They say that this one bacterial enzyme from Methanococcus maricolutus, I think I got that right, is excluded because they looked to a paper, the Zing article, which says that it has a 60% preference for one enzyme over the other. And that's not the case. The enzyme that was actually tested in that paper, which is A14751-2089, was from a different bacteria, Methanococcus aeolicus. So it's a different bacteria. So their facts are wrong anyway. But on the law, that would not warrant running from the lexicography anyway. Now... Do you want to address the stability question? Very happy to, Your Honor. The district court found inherent anticipation. And on the facts and on our consideration of the evidence and the expert testimony, she was certainly not abusing her discretion in doing so. As Your Honor has noted, there are a multitude of references, each of which independently shows the pathway that we're talking about in these claims. And Bolton, in particular, shows us each and every enzyme that inherently operates along that pathway. She focused, in her opinion, on the Leroy reference, as well as some others. But if we look at Leroy in particular, Your Honors, which is A10095. There's a beautiful chart there. Leroy engineered a recombinant yeast, put in a hyper-expressed enzyme for the last part of the pathway, an ADH6 enzyme, which is a dehydrogenase enzyme. And that pathway, and that enzyme which it put in, had a preference for NADH. It's not the carry enzyme. And Leroy mapped out the exact pathway that's in the patent with this recombinant yeast and says isobutanol at the end of the patent. Who discusses... Leroy, the beer reference? Yes. Leroy, I'm sorry, Your Honor. Leroy. Can you address the analogous art question? I'm very happy to. And then address as well, Ms. Benami says, when you start recombining these enzymes, you can turn them off as well as turn them on. Right. Can you address that as well? I certainly can. Can I go in that order? Please, whatever. Well, Leroy tells us explicitly that he turned on the enzyme by doing this recombinant work. He tells us that he got overexpression of the dehydrogenase enzyme. And he explicitly says that in his paper, which begins at A10087. So we know that it worked. We don't have to guess. And he says he made isobutanol. We don't have to guess here. And isobutanol production would have been inherent anyway in this pathway. Now, Leroy tested this outside the cell, right? No, this is... He describes the recombinant engineering of a cell. So this is something that he is saying happens in a cell. Then he draws all the various pathways by which you can get to higher alcohols like isobutanol and explicitly discloses those pathways. And then this ties into the beer reference. Leroy itself is not about beer. But in his chart, he references the Bolton article, which is about beer and biochemistry of beer, as a reference for his pathways and his explanations of the enzymes. So the beer art are the most analogous arts. We're talking about making isobutanol with yeast. We're talking about the fermentation arts. That's what biofuels are all about. And the best evidence is that Leroy himself referenced the beer article, the Bolton article, in his own paper in the chart that we're relying on. So, Your Honor, this is just one of the many separate and independent reasons why the district court was right in finding the claim that there's a substantial question of validity. She could have combined other references and looked at obviousness. She declined to do so because she found anticipation on several different bases in light of a number of the different pieces of art that Your Honor alluded to. But there's no single reference that includes all the steps. There is. What's that? At least Leroy, because Leroy has a recombinant yeast. We know that. Yeah, but it doesn't have the pathway. It does, Your Honor. Where does it recite the claim pathway with all the five enzymes? I'd be very happy to explain. It's at A10095, and there's a chart, Your Honor. I'll just show you so you can reference it. And it shows four of the steps of the pathway. It has a dotted line for one of the steps, and it refers you to Bolton. It incorporates Bolton. It says taken from 21, which is Bolton, in modified form. If we look at Bolton, Your Honor, which is directly referenced here, Bolton lays it out chapter and verse. The entire pathway is at Bolton A09980, and all the enzymes are described at A09997. And the district court was within its rights to credit that evidence and the testimony about that evidence from Dr. Stephanopoulos at page 80 in particular of the transcript. Shall I move to written description, Your Honor? Please. The district court was right to credit the testimony of the expert, Dr. Kirsch, on this point. It's a question of fact and reviewed for clear error. And Dr. Kirsch went through each of the three sections of the specification that plaintiffs relied on to try to show written description, found that it did not describe a PDC deletion. The testimony that was referred to by counsel had to do with Dr. Kirsch saying that one would want to do a PDC deletion. He did not testify that there was any written description of such in the specification or any indication that the inventors possessed that sort of invention as claimed. And that's a very different thing. A mere wish, a suggestion, even obviousness, is not true for written description. Here we don't have any. And I'd like to take, Your Honors, first to column 12, which was alluded to in the earlier part of the argument. There's a discussion of preventing misdirection of pyruvate at column 12, line 15. Two enzymes in the prior art reduce the pyruvate, decarbo, etc. Exactly, exactly. Well, this isn't talking about a gene deletion. This says a decarboxylase with decreased affinity for pyruvate is desired. It's talking about substitution. That's very different. It says let's get an enzyme in here that has less affinity. It doesn't say knock out the gene. And that wasn't part of their invention at the time. The other sections that we talk about in our brief also don't discuss deletion of PDC. There's a general section that says you might want to delete genes here or there. It doesn't say which ones. Then there's reference to an article that's not even incorporated by reference, which doesn't deal with PDC deletion in this context at all. And the district court was right to credit Dr. Kirsch's testimony on this point and her opinion is very careful on these lines. We have another reason for knowing that they didn't possess the invention, which is outside the four corners of the patent but still very relevant. Years later, in a related application that was incorporated by reference into a CIP of the present application, the plaintiff claimed PDC deletion explicitly and described it explicitly. So when they ultimately came into possession of that invention, we believe after reading a GIVO published application, as I think we referenced in our briefs on this subject, they included it in their specification and that has a detailed and accurately written description. That's the same application in which they said that it would be very, very helpful to have an NADH dependent variant because none are known yet. So, Your Honor, there's just no written description here of PDC deletion whatsoever. In terms of the harm factors, if we even get that far, Your Honor, the evidence is that Budimax isn't even going to launch a product until late 2014. There's no real harm here. The quantities that are produced by GIVO today are minimal, easily compensable in damages if necessary if we go all the way through trial and don't prevail. The trial is in April. May I address any other questions that the Court may have? I don't have any other questions, but I do have a comment, and that is it strikes me that you were not as careful as you should have been in the confidentiality markings in the red brief. There are legal citations, descriptions of cases that are more confidential. The Kirsch Declaration parts of that are more confidential. It's a public document. Legal argument is more confidential. I do think you should be more careful about that. I apologize for that, Your Honor. I didn't notice that. I will take a look at that and will be careful. Thank you.  All right. That was a great argument. Thank you, Your Honor. Ben Ami. Your Honor, if you would look at the appendix, page 11350, and it's a mini script so it's really page 265, you will see that Dr. Stephanopoulos, GIVO's expert, says that Leroy is not being cited for the production of isobutanol. Leroy does not show the production of isobutanol. That was argument that the evidence of witness was that it does not, and that is the first point I would like to make. The simple fact of the matter is, just as counsel said, well, when they wanted to say NADH dependent, they said so. In the patent, when they described the carry, they do not say NADPH dependent. Elsewhere in the patent, where they want to say NADPH dependent, they do so. So if you take the definition in the patent and just use the words that are in the definition, all you need to show is that this is an enzyme that uses NADPH. So we are adding preference or dependence or whatever you would like into this claim language, into this specification. This is a case where if you look at the specification when they wanted to say dependence, they did know how, and they did, and they did not say that for a carry enzyme, Your Honor. So we are reading dependence into a definition where it does not exist. That is what the district court did. And you don't go ahead and construe this patent in light of what GIVO does. The fact of the matter is the evidence showed, the public evidence, that GIVO's enzyme does use NADPH. I'd like to consider Claim 14 for a second because Claim 14 does show that this carry was intended to be using NADH. Claim 14 says one or more enzymes, and the evidence of record is that there are only two enzymes that can use NADH, and one of them is the carry. So the support for or more must be the carry enzyme. Similarly, Claim 2 says that the method is being used under anaerobic conditions. Anaerobic conditions, testimony of GIVO's witness, Dr. Glasner, is when you have a lot of NADH. So there you're saying, I can do this anaerobically, where you're going to use a lot of NADH. You have Claim 14 that says one or more of the enzymes is going to be using NADH. That has to include the carry or else you can't say or more. And you have a specification where it has a definition and a section where it says it uses NADPH with no statement of preference, NADPH preference, where when it wanted to say NADPH preference for another enzyme, it used that language. So we are changing the definition that's in the patent. As to Leroy, Dr. Stephanopoulos, and I can't go through the whole record, it is all cited for you, repeatedly said it depends on the conditions, that even in his view of the natural pathway, which has never been proven, he says sometimes it might work, sometimes it might not work. It might be all turned on, it might not be all turned on. What we know from Dr. Klebanoff is, in the actual yeast, some of the enzymes are only being made in this organelle called the mitochondria, some of them are being made in the cytosol. So it's as if I have two different factories. One's in New York, one's in California. How did you get a pathway out of that? They're not together. And that's what the evidence of record is. So, Your Honors, it's nice to go ahead and look at what GEVO does and says, boy, maybe it should be NADH dependent, NADPH dependent, three years later, five years later, what do people want to call these things? But the fact of the matter is that in this patent, in this specification for Cary, it does not say that. It says, uses NADPH, it describes an assay, that assay does nothing, says nothing about dependence. It's a yes or no, can it use the NADPH. Thank you. That concludes our morning.